**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **JULIUS EVANS, K83890** | ) | |
| | ) | |
| **Petitioner,** | ) | |
| | ) | |
| **v.** | ) | **No. 14 C 3930** |
| | ) | |
| **KIM BUTLER, Warden** | ) | **Judge Rebecca R. Pallmeyer** |
| | ) | |
| **Respondent.** | ) | |

<u>**MEMORANDUM OPINION AND ORDER**</u>

Petitioner Julius Evans ("Petitioner" or "Evans") was convicted by a jury of first-degree murder in 2000 and sentenced to natural life in prison.  In this petition for habeas corpus relief pursuant to 28 U.S.C. § 2254, Evans challenges his conviction on two grounds: (1) the prosecutor engaged in misconduct during closing arguments by (a) making improper statements to the jury that an investigator working for Evans' co-defendant caused the government's key witness to recant his earlier statements and (b) unfairly playing on the jury's fear of street gangs; and (2) he was denied effective assistance of post-conviction counsel.  Petitioner's claim regarding ineffective assistance of post-conviction counsel is not cognizable at this stage of the proceeding, and the state courts reasonably concluded that the prosecutor's statements about street gangs did not violate Petitioner's rights.   The court agrees with Petitioner, however, that the prosecutor's improper closing statements about the reasons for the government witness's recantation deprived Petitioner of his constitutional right to a fair hearing, and finds that the state courts' rejection of this claim was based on an unreasonable interpretation of the facts.  The writ is therefore denied in part and entered and continued in part, and counsel will be recruited to pursue this petition.

<u>**BACKGROUND**</u>

**I.      Factual Background and Trial Court Proceedings**

On habeas review, the court presumes the factual findings made by state courts are

correct unless those findings are rebutted by clear and convincing evidence. *See* 28 U.S.C. § 2254(e)(1); *Coleman v. Hardy*, 690 F.3d 811, 815 (7th Cir. 2012). Because certain factual findings in this case are contested, the court draws the following facts from both the Illinois state court decisions and the trial transcripts.

On the evening of August 23, 1996, while a two-door gray Oldsmobile drove slowly past an apartment building on the 3800 block of West Washington Street in Chicago, someone inside the vehicle opened fire. (*People v. Evans*, No. 1-00-3191 (Ill. App. Ct. 1st Dist. Sept. 23, 2002), Ex. A to State Ct. Record [13-1], hereinafter "Direct Appeal Op." at 2; *People v. Evans*, No. 97 CR 32176 (Ill. Cir. Ct., Oct. 2, 2011), Ex. F to State Ct. Record [13-3], hereinafter "Post–Conviction Op." at 2.) One of the bullets hit a man named Moatice Williams, who was sitting on his bicycle outside of the building, killing him instantly. (Post–Conviction Op. at 2.) Chicago Police Officer James Cianella arrived on the scene shortly after the shooting and interviewed two individuals, Margaret Winton and Andrew Jeffers, both of whom witnessed the crime. (Direct Appeal Op. at 2.)

At trial, Margaret Winton (evidently a street vendor) testified that she was on the opposite side of the street from the apartment building on the night of the shooting, selling socks and towels. (*Id.*) She observed Andrew Jeffers and another man named John[1] "pitching quarters" on the sidewalk across the street from her while the victim, Moatice Williams, watched. (*Id.*) Before the shooting, Winton saw a gray, two-door car with tinted windows containing three individuals drive around the block. (*Id.*) Approximately ten minutes later, the same car returned, and she heard, in her estimation, 17 to 18 shots fired from the vehicle. (*Id.* at 2–3.) Winton testified that she saw three individuals in the car, but did not see their faces. (Trial Transcript Vol. II, *People v. Evans*, No. 97 CR 32176, Ex. P to State Ct. Record [13-8], hereinafter "Tr. Vol. II," at H-44.) Officer Cianella testified that when he interviewed Andrew

---

[1] John was never identified beyond his first name, and he did not testify at trial. (Direct Appeal Op. at 5.)

Jeffers on the night of the shooting, Jeffers described the shooters as three black males, one of whom was wearing a white t-shirt. (Direct Appeal Op. at 2; Tr. Vol. II at H-31.) Jeffers also told Officer Cianella that the shooters had driven by in a vehicle and had fired shots. (Tr. Vol. II at H-31.) Jeffers did not identify the shooters that night, and he did not provide Officer Cianella with any height or weight descriptions of the shooters. (*Id.*; Trial Transcript Vol. III, *People v. Evans*, No. 97 CR 32176, Ex. Q to State Ct. Record [13-9], hereinafter "Tr. Vol. III," at I-68.) Officers asked Jeffers to stay and talk to Chicago detectives who were en route to the scene, but he declined and had disappeared by the time the detectives arrived. (Tr. Vol. II at H-31.)

Chicago Police Department detectives Luis Munoz and William Whalen testified that they spoke to Jeffers about the shooting approximately 11 months later, when they visited him at the Vienna Correctional Center in July 1997. (Direct Appeal Op. at 6; Tr. Vol. III at I-51.) The detectives showed Jeffers a photo array of six persons, and Jeffers identified the photographs of Petitioner Julius Evans and his co-defendant Mario Young ("Young") as the shooters. (*Id.*) Munoz and Whalen testified that they visited Jeffers a second time in September 1997, this time accompanied by Assistant State's Attorney ("ASA") Lorraine Scaduto. (Direct Appeal Op. at 4, 6.) Jeffers had been moved from Vienna to a boot camp facility in Du Quoin, Illinois. (Tr. Vol. III at I-31.) ASA Scaduto testified at trial that, during this second meeting in De Quoin, she showed Jeffers photographs of Evans and Young, and Jeffers once again identified the two men as the shooters. (*Id.* at 5.) She also took a signed written statement from Jeffers, which was introduced into evidence at trial and read to the jury. (*Id.*)

In that written statement, Jeffers said that he was pitching quarters with John on the night of the shooting. (*Id.*) Jeffers bent down to pick up some quarters, and when he looked up, he saw a gray two-door Oldsmobile with three people inside, two in the front and one in the back. (*Id.*) Young was firing a weapon from the front-side passenger seat, and Evans was firing a weapon from the back seat. (*Id.*) When the shooting stopped, Jeffers observed that the victim had been injured, and ran across the street to call an ambulance. (*Id.*) The next day,

Jeffers stated, he was again pitching quarters with John in the same location when Evans and Young again drove up, this time in a Suburban. (*Id.*) According to Jeffers' statement, Evans apologized to John for shooting at him the day before and explained that they had mistaken John and the other individuals outside at the time for members of the Travelling Vice Lords gang. (*Id.* at 5–6.)

Detective Munoz testified that, in December 1997, after Jeffers had been released from boot camp and was placed on house arrest, Munoz brought Jeffers to the police station to view a lineup. (*Id.* at 6; Tr. Vol. III at I-163–64.) Jeffers again identified Evans and Young as the shooters. (Direct Appeal Op. at 6.) That same day, Jeffers testified before the grand jury. (*Id.*) ASA Ann Lorenz testified that she spoke with Jeffers before his appearance in front of the grand jury and discussed with him the prior written statement taken by ADA Scaduto. (*Id.*) Before Jeffers' grand jury appearance, ASA Lorenz also showed him photographs of Evans and Young, and Jeffers again identified them as the shooters. (*Id.* at 6–7; Tr. Vol. III at I-113–14.) At trial, ASA Lorenz read aloud Jeffers' grand jury testimony, which echoed his written statement. (Direct Appeal Op. at 7.)

When the prosecution called Jeffers to testify at trial, Jeffers recanted all of his previous statements. (*Id.* at 3.) He testified that he did not see a car drive up, did not see the shooters, and did not make the statements attributed to him. (*Id.*) He also could not recall the content of his grand jury testimony. (*Id.*) Jeffers further denied that he had picked out Evans or Young from a photo array or lineup. (*Id.*) Rather, Jeffers testified that the police had told him which photos to select and which individuals to pick out of the lineup, and to "stick with the story." (*Id.*) He was unable to explain, however, what "story" the police were referencing. (*Id.*) Jeffers further testified that the police had told him "either or" in regards to his written statement and grand jury testimony, which Jeffers interpreted as a threat. (*Id.*) He could not explain, however, what "either or" meant, the context in which the police said the phrase, or why he interpreted it as a threat. (*Id.*)

On cross-examination, Jeffers denied having received anything from Evans in exchange for his trial testimony, and he testified that neither Evans nor any gang members had threatened him regarding that testimony. (*Id.* at 4; Tr. Vol. II at H-150–51.) On re-direct examination, Jeffers again testified that no gang members or anyone else had intimidated him regarding his trial testimony. (Tr. Vol. II at H-171.) The prosecution then asked Jeffers for the first time whether he had been visited by an investigator working for co-defendant Young. (*Id.*) Jeffers responded that he had not:

> Q: It's your testimony today that no gang members or no one intimidated you into giving this testimony, is that right?
>
> A: Right.
>
> Q: But after you were released from boot camp you got a visit from someone working for Mario Young, the co-defendant, didn't you?
>
> A: No.
>
> Q: Didn't an investigator working for Mario Young's lawyer come to your home and ask you questions about what happened and talk to you about the shooting?
>
> A: No.

(*Id.*) On re-cross examination, defense counsel attempted to clarify whether Jeffers had been visited by an investigator, and the following exchange occurred:

> Q: The State's Attorney asked you if you spoke to an investigator when you were out for Mr. Young. Have you spoke to one, sir, is that correct?
>
> A: Who?
>
> Q: The State's Attorney just asked you if you spoke to an investigator for Mario Young when you were released from custody, is that correct, sir?
>
> A: When I was released from custody.
>
> Q: Right, when you were out.
>
> A: Right.

Q: And did you tell them, did you stick with the story with that investigator, sir?

A: No. . . .

Q: So you told that person what you told the grand jury, correct?

A: Yeah.

Q: Because you didn't stick with the story?

A: Right. . . .

Q: And you didn't tell that person what you told Whalen and Munoz back in July while you were in [the boot camp] because you didn't stick with the story, correct?

A: No.

Q: You told them your version, is that correct, sir?

A: Yes.

(*Id.* at H-175–76.) On further re-direct examination, the prosecutor returned to the issue of

whether Jeffers had spoken with Young's investigator:

Q: I thought you just said you don't remember being visited by an investigator for Mario Young, the co-defendant, after you were released from custody; didn't you just say that ten minutes ago?

A: You asked me if she came to my house.

Q: Who is it that came and visited you?

A: Didn't no one come to my house.

Q: Where did they visit you at?

A: I don't remember. She didn't come to my house.

. . .
A: Whoever she was.

Q: I'm sorry?

A: Whoever she was, she didn't come to my house, whatever you say.

| | |
|---|---|
| Q: | But you know it was an investigator who worked for Mario Young, the defendant in this case, didn't you? |
| A: | No. |
| Q: | You didn't know that? |
| A: | No. |
| Q: | Who did you think it was? |
| A: | I don't know who it was. She just asked me questions and I talked to her. |
| Q: | Asked you questions about the shooting, right? |
| A: | Yeah. |
| Q: | And that's when you decided to start saying that you didn't see who did the shooting, right? |
| A: | I told her the truth. |

(*Id.* at H-176–77.)  Jeffers' trial testimony was the only evidence relating to whether Jeffers was, or was not, visited by an investigator working for the defense.

Chicago Police Department Detective Michael Kronin testified at trial regarding gang activity in Chicago, including his observation that, around the time of the shooting, the Unknown Vice Lords gang, also known as the Ghost Town Players, and the Travelling Vice Lords gang, were engaged in a battle over drug-sale territory.  (Direct Appeal Op. at 7.)  Evans' co-defendant Young was a known member of the Unknown Vice Lords, according to Kronin.  (*Id.*)

In his initial closing arguments, the prosecutor made no mention of gangs or Jeffers' alleged conversation with Young's investigator.  In the defense closing, counsel argued that Jeffers had not witnessed the events in question, and suggested that Jeffers had fabricated the story he gave to the authorities while in custody.  (Tr. Vol. III at I-170, I-178.)  Then in rebuttal argument, the prosecution offered an explanation for Jeffers' inconsistency:

> The police interviewed Andrew Jeffers on the street in front of his house on the block where he lived across the street from where the Travelling Vice Lords, the gang bangers, sell drugs, where gang bangers dominate the neighborhood, . . . .  Minutes after he

> saw a man get gunned down by these people . . . is anyone at all
> surprised that Andrew Jeffers would not make the identifications in
> that situation?

(*Id.* at I-182.)  When the police had approached Jeffers later at the boot camp, the prosecution

suggested, Jeffers had given a more complete story "because now he's away from the street

where the gang bangers dominate."  (*Id.* at I-184.)  Then, the prosecutor went on to assert that

after Jeffers had received a visit from co-defendant Young's investigator, Jeffers changed the

story he provided to police because he realized that the defendants knew where to find him:

> [Jeffers] had identified [the defendant and Mario Young] in photos
> in the Grand Jury.  It only changed after he was released from
> custody when lo and behold he gets a visit from an investigator
> working for the lawyer for Mario Young, the defendant's co-
> offender. . . .  An investigator comes to visit him, and that person
> apparently interviews Andrew Jeffers. . . .  Andrew Jeffers now
> knows when the investigator visits him they know how to find
> him. . . .  They know where he is at.  The gang bangers that
> executed Moatice Williams on the street right next to him know how
> to find Andrew Jeffers. They can come and see him whenever they
> want. . . .  What a surprise that Andrew Jeffers after being visited
> by Mario Young's investigator would suddenly forget everything
> that he saw . . . .  You can draw your own conclusions.  Andrew
> Jeffers now knows that Mario Young or his investigator knows how
> to find Andrew Jeffers.

(*Id.* at I-187–89.)  In addition to calling Petitioner and his co-defendant "gang bangers," the

prosecutor asserted that the shooting had been motivated by gang violence:

> [Evans and Young] were trying to shoot Travelling Vice Lords
> because there was a conflict going on on that block between them
> and the Travelling Vice Lords, and because they came there that
> night to shoot Travelling Vice Lords and because as . . . they
> usually do they hit the wrong person.
>
> The evidence in this case shows that [Moatice Williams] was
> gunned down in cold blood by this defendant. . . .  It was over
> some silly nonsensical gang drug territory conflict.  This defendant
> and his buddy, Mario Young . . . drove up in a car and Mario
> Young, whose gang was in conflict with the gang selling drugs at
> that territory at that time this defendant opened fire.

(*Id.* at I-199–200.)  During the prosecution's rebuttal argument, defense counsel made several

objections to the prosecutor's statements regarding Jeffers' visit from an investigator working on

behalf of co-defendant Young, as well as the prosecutor's statements relating to gangs. The court overruled all of these objections. (*Id.* at I-182–200.)

Following the trial, the jury issued a guilty verdict and convicted Petitioner of first-degree murder. In his post-trial motion for a new trial, Petitioner objected to the prosecutor's closing comments that Young's investigator had visited Jeffers and argued that these comments prejudiced the jury against Petitioner. (*Id.* at K-1–7.) After denying Petitioner's motion, the trial court sentenced Petitioner, who had by then been sentenced to 50 years for an unrelated murder, to a term of natural life in prison. (*Id.* at K-8, K-12.)

## II.    Direct Appeal

Petitioner appealed his conviction to the Appellate Court of Illinois, First District. He made two arguments on direct appeal: that the state engaged in prosecutorial misconduct in closing arguments by: (1) implying that co-defendant Young's investigator caused the witness Andrew Jeffers to recant his earlier statements; and (2) "unfairly play[ing] on the jury's fear and loathing of street gangs." (Direct Appeal Op. at 1; Pet. Direct Appeal Br. [13-1] at 2.) In a written order dated September 23, 2002, the Appellate Court affirmed the judgment of the trial court. (Direct Appeal Op. at 1.)

Regarding the prosecutor's closing statements that Jeffers changed his story after speaking with a defense investigator, the Appellate Court determined that "the State made a reasonable inference [of witness intimidation] from the evidence which demonstrated that Jeffers dramatically changed his testimony at trial after receiving a visit from an investigator sent by codefendant Young, a known gang member." (*Id.* at 13–14.) Petitioner had argued in his brief that Jeffers denied having been visited by an investigator, but the court found that this argument was "belied by the record" because "Jeffers admitted that he did, in fact, meet with [co-defendant Young's] investigator." (*Id.* at 14–15.)

With respect to the prosecutor's gang-related closing statements, the court found that Petitioner had waived any argument regarding these statements:

> [T]he state contends that defendant's argument is waived because he did not . . . raise this claim of error in his post trial motion. We agree. . . . Because defendant failed to properly preserve the issue he now raises, it is waived on appeal.

(*Id.* at 16.) The court went on to conclude that, even if it were to ignore the waiver doctrine, Petitioner's appeal would fail on the merits because the prosecutor's arguments were proper:

> Even if we were to ignore the waiver doctrine, however, defendant's position would not be much improved because . . . there was ample evidence of gang motivation at trial . . . . Although [the] evidence [did] not unequivocally prove that defendant was a gang member, it [did] establish that defendant was participating in gang activity, specifically a drive-by shooting, with a known gang member and that the shooting was motivated by gang rivalry.

(*Id.* at 16–18.)

Petitioner raised the same two prosecutorial misconduct arguments in his petition for leave to appeal to the Supreme Court of Illinois. (Petition for Leave to Appeal, Ex. E to State Ct. Record [13-2] at 3.) On December 5, 2002, the Illinois Supreme Court denied the petition without comment. *People v. Evans*, 202 Ill. 2d 628, 787 N.E.2d 161 (Ill. 2002).

## III. Post-Conviction Proceedings

Petitioner filed a *pro se* petition for post-conviction relief with the trial court on May 29, 2003. (Petition for Post-Conviction Relief, Ex. G to State Ct. Record [13-3] at 1.) In his petition, Petitioner argued that he was denied the right to a fair trial and effective assistance of counsel because his trial attorney failed to object to the prosecutor's improper closing, which was "intended to inflame [the] jury's fear and loathing of gangs," and made statements "as to [the] reason [a] witness recanted" that were unsupported by the evidence. (*Id.* at 16.) Specifically, Petitioner alleged, "[t]he state asserted the position that the motive for the shooting was a struggle over territorial drug rights," even though "it presented absolutely no evidence that this was the case." (*Id.* at 19.) Petitioner also argued that the government "knew that [Andrew] Jeffers had not been threatened by anyone . . . to recant." (*Id.* at 20.) Petitioner brought

several other claims not raised before this court, including ineffective assistance of appellate counsel and abuse of discretion by the trial court.[2] (*Id.* at 1–2, 13–16.)

Post-conviction counsel was appointed to assist Evans after he filed his initial *pro se* petition. (Post-Conviction Brief, Illinois Court of Appeals, [13-4] at 10.) Post-conviction counsel filed a Rule 651(c) certificate but chose not to make any amendments to the petition. (*Id.*); *see* ILL. S. CT. R. 651(c) (stating that once appointed, a petitioner's attorney must file a certificate showing that the attorney has consulted with petitioner, has examined the record, and has made any necessary amendments to the *pro se* petition). The state moved to dismiss the petition, and the trial court granted that motion on October 2, 2011, finding that Petitioner had waived his ineffective assistance of trial counsel and trial court error claims by failing to raise them on direct appeal. (Post-Conviction Order, Illinois Circuit Court, Oct. 2, 2011 [13-3] at 4–5.) Even if the claims were not waived, the court concluded that they lacked merit because they were "conclusory and devoid of supporting facts." (*Id.* at 5.) With respect to Petitioner's ineffective assistance of appellate counsel claim, the court held that Petitioner had failed to meet the test set forth in *Strickland v. Washington*, 466 U.S. 668 (1984). (*Id.* at 11.)

With the assistance of appointed counsel, Petitioner appealed the court's October 2, 2011 order, arguing that his post-conviction counsel had failed to provide reasonable assistance under Illinois Supreme Court Rule 651(c), primarily for deciding not to obtain affidavits from witnesses or obtain transcripts from his co-defendant's trial. (Post-Conviction Order, Illinois Court of Appeals, Dec. 13, 2013, at 1.) The Illinois Appellate Court affirmed the dismissal of the petition in an unpublished order. The court held that Petitioner had failed to rebut the presumption of reasonable assistance; although Petitioner's post-conviction counsel did not

---

[2]    Petitioner also alleged that his trial counsel had failed to interview key witnesses, had failed to move to substitute the biased trial judge, and had attempted to coerce Petitioner into entering into a plea agreement. (*Id.* at 3.)

submit any affidavits or supporting documents, the court found that Petitioner had failed to prove that his counsel did not attempt to secure these documents. (*Id.*)

After his petition for leave to appeal was denied by the Illinois Supreme Court, Petitioner filed the instant habeas petition with this court pursuant to 28 U.S.C. § 2254. (Petition [1].) In his petition, Evans argues that he was denied effective assistance of post-conviction counsel, and that the prosecutor's closing arguments deprived him of due process by unfairly playing on the jury's fear of street gangs and incorrectly suggesting that Petitioner had caused the government's key witness to recant earlier-made statements. (*Id.* at 5.)

<u>DISCUSSION</u>

"[A] district court shall entertain an application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court only on the grounds that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). There is a "presumption that state courts know and follow the law." *Woodford v. Visciotti,* 537 U.S. 19, 24 (2002). Accordingly, a federal court may issue a writ of habeas corpus only if one of two conditions is satisfied: the state court's judgment "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d).

Before a federal court may review the merits of a petition for habeas corpus, the petitioner must exhaust all remedies available in state courts. *Bocian v. Godinez,* 101 F.3d 465, 468 (7th Cir. 1996). Respondent concedes that exhaustion is not an issue in this case. (Answer [12] at 5.) However, Respondent argues that the petition should be denied because: (1) Evans' ineffective assistance of counsel claim is not cognizable on federal habeas review, (2) Evans procedurally defaulted his claim that the prosecutor erred in closing argument by suggesting that the shooting was gang-related, and (3) the state courts reasonably concluded

that the prosecutor's closing statements regarding gangs and witness intimidation were neither improper nor prejudicial. (*Id.* at 7–15.) The court reviews each of Petitioner's federal habeas claims, as well as Respondent's arguments, in turn.

## I.    Ineffective Assistance of Post-Conviction Counsel Claim

Petitioner argues that he is entitled to relief, in part, because he received ineffective assistance of post-conviction counsel in his state court collateral proceedings. As Respondent correctly notes, however, this claim is not cognizable on federal habeas review. (Answer at 7.) Section 2254 expressly provides that "[t]he ineffectiveness or incompetence of counsel during Federal or State collateral post-convictions shall not be a ground for relief in a proceeding arising under [this] section." 28 U.S.C. § 2254(i); *see also Coleman v. Thompson*, 501 U.S. 722, 725 (1991) ("Because there is no constitutional right to an attorney in state postconviction proceedings . . . a petitioner cannot claim constitutionally ineffective assistance of counsel in such proceedings." (internal citations and quotations omitted)). Petitioner's ineffective assistance of post-conviction counsel claim is therefore dismissed.

## II.    Prosecutorial Misconduct Claims

Petitioner's remaining claim, which alleges that statements made by the prosecutor denied Petitioner the right to a fair trial, warrants more careful consideration. To prove prosecutorial misconduct, a petitioner must demonstrate both that statements made by the prosecutor were improper and that those improper statements deprived petitioner of a fair proceeding. *Darden v. Wainwright,* 477 U.S. 168, 181 (1986). "[T]he relevant question is whether the prosecutor['s] comments so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Ruvalcaba v. Chandler*, 416 F.3d 555, 565 (7th Cir. 2005) (quoting *Darden*, 477 U.S. at 181). In *Darden*, the Supreme Court set forth six factors that courts should consider in deciding this question: "(1) whether the prosecutor misstated the evidence, (2) whether the remarks implicate specific rights of the accused, (3) whether the defense invited the response, (4) the trial court's instructions, (5) the weight of the

13

evidence against the defendant, and (6) the defendant's opportunity to rebut." *Howard v. Gramley*, 225 F.3d 784, 793 (7th Cir. 2000) (citing *Darden*, 477 U.S. at 181–82). The court considers these factors in its analysis of Petitioner's claims that the prosecutor made improer statements in closing.

### A. Closing Statements Regarding Petitioner's Gang Affiliations

Petitioner contends that, during its rebuttal closing argument, the prosecution made statements that improperly played to the jury's "fear and loathing" of street gangs. In response, Respondent argues that Petitioner's claim is procedurally defaulted based on the Illinois Appellate Court's holding on direct appeal that Evans had waived the claim by failing to raise it in a post-trial motion. (Answer at 8.) Even if it is not procedurally defaulted, Respondent asserts that the state court made a reasonable decision that the prosecutor's gang-related statements were proper. (*Id.* at 14-20.)

#### 1. Procedural Default

If a state court does not reach a federal issue because it relied upon a state procedural bar, such as waiver, as an independent basis for its disposition of the claim, the claim is procedurally defaulted and the matter is closed to the federal habeas court absent a showing of cause and prejudice. *Gray v. Hardy*, 598 F.3d 324, 327–28 (7th Cir. 2010); *Wainwright v. Sykes*, 433 U.S. 72, 90–91 (1977). The Supreme Court has recognized, however, that it is not always clear from the face of a state court opinion whether the state court relied upon a state procedural bar as an independent basis for its decision. A state court may decide that a claim is procedurally barred, for example, and then "reach the merits of a federal claim in an alternative holding." *Moore v. Bryant*, 295 F.3d 771, 775 (7th Cir. 2002). In such a situation, procedural default "'curtails reconsideration of the federal issue on federal habeas,'" *id.* (quoting *Harris v. Reed*, 489 U.S. 255, 264 n.10 (1989)), only if the state court "actually state[s] in plain language that it is basing its decision on the state procedural default and that other grounds are reached only in the alternative," *Jenkins v. Nelson*, 157 F.3d 485, 491 (7th Cir. 1998) (citing *Rogers–Bey*

*v. Lane*, 896 F.2d 279, 282 (7th Cir. 1990)); *Lee v. Foster*, 750 F.3d 687, 693 (7th Cir. 2014) (quoting *Harris*, 489 U.S. at 263).  Without this "plain statement," the court will presume that the federal claim was reached.  *Michigan v. Long,* 463 U.S. 1032, 1042 (1983); *Harris*, 489 U.S. at 1043.

In this case, the Illinois Appellate Court did not expressly state that its rejection of Petitioner's "fear and loathing" argument was based on the state procedural bar of waiver.  The state court did at least partially rely on waiver in rejecting Petitioner's claim, as the court began its discussion with the finding that "[b]ecause defendant failed to properly preserve the issue he now raises, it is waived on appeal."  (Direct Appeal Op. at 16.)  The court nevertheless went on to consider Petitioner's claim on the merits and rejected the claim on that basis, as well:

> Even if we were to ignore the waiver doctrine, however, defendant's position would not be much improved because, as the State argues in its appellate brief, there was ample evidence of gang motivation presented at trial, and therefore, the complained of argument was proper.

(*Id.*)  There is no relevant distinction between these facts and the facts in *Harris*.  In that case, the Supreme Court addressed an appellate court decision that referred to a state procedural bar (waiver) and then "went on to consider and reject petitioner's ineffective-assistance claim on its merits."  *Harris*, 489 U.S. at 258.  The Court explained that the state court must make a plain statement that it relied on an independent and adequate state ground, and concluded that the appellate court's decision "falls short of an explicit reliance on a state-law ground."  *Id.* at 266. Accordingly, the *Harris* Court determined that habeas review was not barred.

The court reaches the same conclusion here.  Although the Illinois Appellate Court determined that Petitioner had waived his claim, the court did not expressly state that its rejection of the claim stood on that ground alone.  Instead, the court suggested that it might "ignore the waiver doctrine" and reject the claim on its merits.  This is not a sufficiently "plain statement" to foreclose federal habeas review.

### 2. Merits

The court, therefore, turns to the merits of Petitioner's claim of improper statements in the prosecution's rebuttal closing argument that the shooting resulted from a gang-related conflict. (Petition at 9–11.) The prosecutor specifically argued that the shooting was motivated by a "silly nonsensical gang drug territory conflict," and that Petitioner and his co-defendant were "gang bangers" who accidentally shot the wrong person in an assault on a member of a rival gang, the Travelling Vice Lords. These statements were improper, Petitioner contends, because "evidence of [Petitioner's] purported gang affiliation was insufficiently proved." (*Id.* at 11.)

In rejecting Petitioner's claim that the prosecutor's gang-related statements were improper, the Illinois Appellate Court principally relied on *Darden*'s first and third prongs (whether the prosecutor misstated the evidence and the weight of the evidence against the defendant), concluding that "there was ample evidence of gang motivation presented at trial." (Direct Appeal Op. at 16.) In its decision, the Illinois Appellate Court pointed to the fact that, according to Jeffers' prior written statement and grand jury testimony, both of which were admitted into evidence for their truth,[3] Petitioner returned to the crime scene the day after the shooting and apologized for the shooting, stating that he had believed Jeffers and the others were members of the Travelling Vice Lords. (*Id.*) The court further noted that gang-crimes specialist Kronin testified that, "at the time of the shooting, the Unknown Vice Lords (the gang to which codefendant Young belonged) was involved in a conflict with the Travelling Vice Lords over drug-sale turf." (*Id.* at 17.) "Although this evidence does not unequivocally prove that

---

[3]    Jeffers' prior inconsistent statements made to Detectives Whalen and Munoz and ASA Scaduto were presumably admissible for their truth because Jeffers had signed the photographs and written statement, and Jeffers' grand jury testimony was admissible because it was made under oath. (Tr. Vol. III at I-213); *see* 725 ILCS § 5/115-10 (prior inconsistent statements admissible as non-hearsay if they are made under oath, or if they describe, narrate, or explain an event of which the witness had personal knowledge and the statement is proved to have been written or signed by the witness).

[petitioner] was a gang member," the court reasoned, "it does establish that [petitioner] was participating in gang activity . . . with a known gang member and that the shooting was motivated by gang rivalry." (*Id.* at 18.)

The Illinois Appellate Court did not specifically address *Darden*, but that is not dispositive of whether the standard set forth in that decision was violated. *See* 28 U.S.C. § 2254(d); *Hough v. Anderson,* 272 F.3d 878, 903 (7th Cir. 2001) (finding the state court's reasoning sufficient even though it "did not recite with precision the factors set forth in *Darden*"). At trial, Jeffers denied having provided truthful statements to law enforcement, but Jeffers' earlier statements were admitted into evidence, and it was therefore permissible for the prosecutor to rely on them in making comments about Petitioner's gang affiliations. The Appellate Court also concluded that Jeffers' statements to law enforcement and Detective Kronin's testimony supported a reasonable inference that the shooting was motivated by a gang conflict over drug-sale territory: Evans reportedly told Jeffers that he had intended to shoot a member of the Travelling Vice Lords, Evans' co-defendant was a member of the Unknown Vice Lords, and the Travelling Vice Lords and Unknown Vice Lords were engaged in a territorial conflict at the time of the shooting. (Direct Appeal Op. at 17–18); *see United States v. Klebig*, 600 F.3d 700, 718 (7th Cir. 2009) ("Although prosecutors may not 'infuse their closing arguments with facts that the court has not admitted into evidence, they may argue reasonable inferences from the evidence that the jury has seen and heard.'" (citing *United States v. Waldemer*, 50 F.3d 1379, 1383 (7th Cir. 1995))).

Nor is the court able to conclude that the prosecutor's intent in making these remarks was "to inflame the passions of the jury," *Waldemer*, 50 F.3d at 1384, by playing on their "fear and loathing" of street gangs. Instead, the prosecutor's objection may have been providing the jury with a motive for the crime, and suggesting reasons why Jeffers may have been reluctant to tell the police the complete story on the night of the shooting. *See United States v. Jiminez*, No. 94-2625, 1995 WL 135923, at *3 (7th Cir. Mar. 28, 1995) ("A prosecutor does not engage in

misconduct by introducing and commenting on otherwise admissible, relevant evidence of gang membership and fear of gang retaliation, unless he uses it as a 'springboard' for more general prejudicial comments inconsistent with the purpose of its admission." (internal quotations omitted)). The prosecutor did refer to Petitioner as a "gang banger," but it is not unconstitutional for a prosecutor to make strongly-worded characterizations of a defendant. *See, e.g.*, *United States v. Durham*, 211 F.3d 437, 440 (7th Cir. 2000) ( "nothing objectionable in the prosecutor's description of the defendant as a 'slick little dope dealer'"); *United States v. Spivey*, 859 F.2d 461, 466 (7th Cir. 1998) (prosecutor's description of defendants as "con men" was not improper).

The other *Darden* factors are not obviously dispositive. Factors three and six appear to weigh in Petitioner's favor because Petitioner did not invite the prosecutor's comments and he did not have an opportunity to rebut them. But factors two and four weigh in Respondent's favor, as the prosecutor's comments did not implicate a specific right of Petitioner's, such as the right to remain silent or to confront witnesses against him, and the trial court instructed the jury that closing arguments are not evidence. (Tr. Vol. III at I-204.) The court is unable to conclude that the Illinois Appellate Court's ruling on this issue was unreasonable, but will invite appointed counsel to consider this issue.

### B. Closing Statements Regarding Witness Intimidation

Petitioner next claims that the prosecution's rebuttal closing arguments suggested that the co-defendant's investigator had intimidated Jeffers into changing his testimony and denied Petitioner a fair trial. In its rebuttal closing, the prosecutor stated:

> [Jeffers' story] only changed after he was released from custody when lo and behold he gets a visit from an investigator working for the lawyer for Mario Young, the defendant's co-offender. . . . Andrew Jeffers now knows when the investigator visits him they know how to find him. . . . They know where he is at. The gang bangers that executed Moatice Williams on the street right next to him know how to find Andrew Jeffers. They can come and see him whenever they want. . . . What a surprise that Andrew Jeffers after being visited by Mario Young's investigator would suddenly forget

> everything that he saw . . . . You can draw your own conclusions.
> Andrew Jeffers now knows that Mario Young or his investigator
> knows how to find Andrew Jeffers.

(Tr. Vol. III at I-187–89.)  Petitioner claims that these closing statements were "unsupported by the evidence" and were "designed to give the impression that [Petitioner] threatened and/or intimidated [Jeffers] to recant his earlier statements."  (Petition at 9.)

Again, in rejecting Petitioner's claim, the Illinois Appellate Court relied primarily on *Darden*'s first factor: whether the prosecutor misstated the evidence.  The court determined that the prosecutor's closing remarks were properly based on the evidence presented at trial, namely that "Jeffers identified the defendant as the shooter in this case on five separate occasions and that his testimony only changed after he was released from custody and visited by [co-defendant Young's] investigator."  (Direct Appeal Op. at 14.)  Based on this evidence, the court opined, "[t]he State made a reasonable inference [of witness intimidation]."  (*Id.* at 13-14.)  The court also found that Petitioner's argument that "Jeffers denied being visited by [the co-defendant's] investigator" was "belied by the record" because "Jeffers admitted that he . . . [met] with this investigator" on cross examination.  (*Id.* at 14.)  The Illinois Appellate Court further indicated that the prosecutor's remarks were not prejudicial because "the State did not overtly argue that [Petitioner] threatened or intimidated the witness.  Rather, the State questioned why the witness changed his story after receiving a visit from codefendant's investigator, and then invited the jury to reach its own conclusion based on that information."  (*Id.* at 13.)

As this court reads the record, these findings appear to overstate the evidence.  True, two of the *Darden* factors weigh in favor of Respondent: the prosecutor's remarks did not implicate specific rights of Petitioner's (factor two), and the trial court instructed the jury that closing arguments were not evidence (factor four).  The court also recognizes that factual determinations by state courts are generally presumed correct on federal habeas review.  *See* 28 U.S.C. § 2254(e)(1); *Miller-El v. Cockrell*, 537 U.S. 322, 324 (2003).  This presumption is less secure here, however, because there was no evidence that the person who spoke to

Jeffers after his release from custody was associated with counsel for Petitioner's co-defendant. Petitioner has made a substantial showing that the prosecutor's statement to that effect was unsupported.  *See* 28 U.S.C. § 2254(e)(1) (petitioner bears the burden of rebutting the presumption that a state court's factual determination is correct "by clear and convincing evidence").

A brief review of the trial testimony:  At trial, Andrew Jeffers recanted all of his statements identifying Evans as involved in the shooting.  Then on re-direct, Jeffers was asked whether he had received a visit from an investigator working for Petitioner's co-defendant Young.  (Tr. Vol. II at H-171.)  Jeffers testified that he had not.  (*Id.*)  On re-cross examination, defense counsel asked Jeffers about this testimony.  Counsel assumed there had, in fact, been a meeting with an investigator, and he asked Jeffers whether, in speaking with that investigator, Jeffers had "[stuck] with the story" he had given earlier.  (*Id.* at H-175.)  Jeffers initially responded, "No," but when asked whether he had "told that person what [he] told the grand jury," Jeffers responded, "Yeah." (*Id.*)  Defense counsel also asked Jeffers whether he had "told that person what [he] told [Detectives] Whalen and Munoz back in July" (apparently a reference to the interview in July 1997, when Jeffers was at the Vienna Correctional Facility), to which Jeffers responded, "No."  (*Id.*)

The prosecutor pursued the issue yet again on re-direct examination.  (*Id.* at H-176-77.)  Jeffers first denied that he had ever met with an investigator at his home.  (*Id.*)  He acknowledged that he had been visited by an investigator, but claimed he did not know who she was:

> Q:    I thought you just said you don't remember being visited by an investigator for Mario Young, the co-defendant, after you were released from custody; didn't you just say that ten minutes ago?
>
> A:    You asked me if she came to my house.
>
> Q:    Who is it that came and visited you?

A:     Didn't no one come to my house.

Q:     Where did they visit you at?

A:     I don't remember. She didn't come to my house. . . . Whoever she was. . . . Whoever she was, she didn't come to my house, whatever you say.

Q:     But you know it was an investigator who worked for Mario Young, the defendant in this case, didn't you?

A:     No.

Q:     You didn't know that?

A:     No.

Q:     Who did you think it was?

A:     I don't know who it was. She just asked me questions and I talked to her.

(*Id.*)

Jeffers' testimony is obviously muddled, but one thing is clear: Jeffers never testified that he spoke with an investigator working for Petitioner's co-defendant Young. Both attorneys asked Jeffers whether he had spoken to someone about the shooting, and Jeffers acknowledged that he had. There was no evidence that this visit took place at Jeffers' home, however, nor was there any evidence that Petitioner understood the visitor was a defense investigator or had any affiliation with Petitioner or his co-defendant. At just one point during re-direct examination, Jeffers was asked specifically whether he had spoken to or received a visit from an investigator working for Petitioner's co-defendant Young. He denied this.

The prosecutor nevertheless stated several times during the rebuttal portion of his closing that Jeffers had received a visit from co-defendant Young's investigator after being released from custody. This appears to be a misstatement of the evidence. And though Jeffers firmly denied that anyone had visited him at his home, the prosecutor emphasized that the investigator had in fact visited Jeffers' home and that this visit meant that Jeffers would have understood that gang members would "know how to find him." The prosecutor continued by

urging the jury to conclude that Young's investigator had intimidated Jeffers into recanting his earlier identification of Petitioner as the shooter. The prosecutor's suggestion that Petitioner or Petitioner's co-defendant intimidated Jeffers not only incorrectly represented the evidence, but could well have been prejudicial. *See United States v. Thomas*, 86 F.3d 647, 655 (7th Cir. 1996) (threat or intimidation "appeals to the jury's sympathies, arouses a sense of horror, provokes its instinct to punish, or otherwise may cause a jury to base its decision on something other than the established propositions in the case" (quoting *United States v. Guerrero*, 803 F.2d 783, 785 (3d Cir. 1986))); *see also United States v. Calabrese*, 572 F.3d 362, 368 (7th Cir. 2009) ("[I]ntimidation of a witness suggests consciousness of guilt." (internal citations omitted)).

Under *Darden*, the prosecution's misstatement of the evidence does not necessarily mean that Petitioner was denied the right to a fair trial. Improper statements support relief only if they "so infected the trial with unfairness as to make the resulting conviction a denial of due process.'" *Darden,* 477 U.S. at 181 (quoting *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974). In assessing this question, the court must consider the fifth factor in the *Darden* analysis: the weight of the evidence. This matter, too, raises troubling issues: The evidence against Petitioner in this case depended on the credibility of the out-of-court statements of a single witness: Jeffers. Jeffers recanted those statements at trial. No physical evidence connected Petitioner to the shooting, and the only other eyewitness did not see the shooters. Nor was Jeffers' earlier statement particularly compelling evidence. According to the prosecutor's version of events, Jeffers and "John" had returned to a street corner to pitch quarters at the very same location where, just one day earlier, there was a deadly shooting in which John was the (apparent) intended victim. In this version, not only do Jeffers and John return to the scene, but the shooters themselves do, as well, purportedly to apologize for their conduct. At the scene, on the day of the shooting, Jeffers failed to identify the shooters, but then 11 months later—when he was in custody and potentially had an interest in cooperating with law enforcement—pointed the finger at Evans. Once he was at liberty, his story changed

again. In short, Jeffers may very well not have been telling the truth at trial, but that does not mean that the version he gave earlier was the truth, either. And given that his recanted statement was the only piece of evidence against Evans, the prosecutor's improper suggestion that Jeffers had been intimidated by the co-defendant's investigator into providing false testimony at trial was likely to have had a significant impact on the jury's decision to convict Petitioner. *See, e.g.*, *Owens v. Duncan*, 781 F.3d 360, 365 (7th Cir. 2015) (reversing denial of habeas petition where defendant's conviction was based on misstatement of evidence and "two shaky eyewitness identifications").

Two other *Darden* factors raise concern. There is no indication that Petitioner invited the prosecution's comments about the affiliation of the investigator or a visit at Jeffers' home (factor two). During closing argument, defense counsel suggested that the police had directed Jeffers to make statements implicating Petitioner in the crime, but those suggestions were based on Jeffers' own testimony that the police had told him to "stick with the story." With respect to factor six, because the prosecution's statements were made in its rebuttal closing argument, Petitioner did not have an opportunity to rebut the improper remarks. Considering all of the *Darden* factors together, and more importantly, *Darden*'s concern with unfairness, the court has serious concerns that the prosecutor's statements in this case denied Petitioner "the right to have [his] guilt or innocence adjudicated on the basis of evidence introduced at trial." *Owens*, 781 F.3d at 365.

## CONCLUSION

For the reasons set forth above, Petitioner's federal habeas petition is granted in part and entered and continued in part. Petitioner's claim of ineffective assistance of post-conviction counsel is not cognizable on federal habeas review. The court will appoint counsel to investigate and brief Petitioner's claim that the prosecutor made improper closing statements that played to the jury's "fear and loathing" of street gangs and his claim that the prosecutor made improper closing statements regarding witness intimidation. The court requests that

Attorney Mark E. Schneider, Kirkland & Ellis LLP, 300 North LaSalle, Chicago, IL 60654 represent Petitioner in accordance with Mr. Schneider's trial bar obligations under the District Court's Local Rule 83.37 (N.D. Ill.)  A status conference is set for August 10, 2016, at 9:00 a.m.

ENTER:

Dated: July 6, 2016

_____

REBECCA R. PALLMEYER
United States District Judge