**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **JULIUS EVANS, K83890,** | ) | |
| | ) | |
| **Petitioner,** | ) | |
| | ) | |
| **v.** | ) | **No. 14 C 3930** |
| | ) | |
| **JACQUELINE LASHBROOK, Warden,** | ) | **Judge Rebecca R. Pallmeyer** |
| | ) | |
| **Respondent.** | ) | |

## MEMORANDUM OPINION AND ORDER

On June 28, 2000, Petitioner Julius Evans ("Petitioner or "Evans") was convicted in the Circuit Court of Cook County of first-degree murder and sentenced to natural life in prison. Petitioner filed a petition for habeas corpus relief [1] pursuant to 28 U.S.C. § 2254 in May 2014, claiming that he was denied his right to a fair trial. In July 2016, this court issued an opinion that addressed Petitioner's claims at some length and appointed counsel to investigate and brief others [18]; *Evans v. Butler*, No 14 C 3930, 2016 WL 3633315, at *1–6 (N.D. Ill. July 6, 2016). The court now addresses Evans's amended petition [33],[1] in which he claims that the prosecutor engaged in misconduct during rebuttal closing arguments by (a) referring to him as a gang member, which unfairly played on the jury's fear of gangs, and (b) stating to the jury that an investigator working for Evans's codefendant caused the government's key witness to recant his earlier statements. The court finds that the prosecutor's comments about Petitioner's gang affiliations were not improper. The court agrees with Petitioner, however, that the prosecutor's remarks about witness intimidation deprived him of his constitutional right to a fair hearing, and concludes that the state court's rejection of this claim was unreasonable. The writ is therefore granted.

---

[1]     During the pendency of this case, Jacqueline Lashbrook replaced Kim Butler as Petitioner's custodian at the Menard Correctional Center in Chester, Illinois. *See* FED. R. CIV. P. 25(d).

## BACKGROUND

**Factual Background and Trial Court Proceedings**

The court previously discussed the underlying facts and procedural history of this case in its earlier order, *see Evans,* 2016 WL 3633315, at *1–6 (N.D. Ill. July 6, 2016), but reviews the material facts here as well.

On habeas review, the court presumes the factual findings made by state courts are correct unless those findings are rebutted by clear and convincing evidence. *See* 28 U.S.C. § 2254(e)(1); *Coleman v. Hardy*, 690 F.3d 811, 815 (7th Cir. 2012). Because certain factual findings in this case are contested, the court draws the following facts from both the Illinois state court decisions and the trial transcripts.

At approximately 6:40 p.m. on August 23, 1996, a two-door gray Oldsmobile drove past an apartment building at 3843 West Washington in Chicago, and someone inside the vehicle opened fire. (*People v. Evans*, No. 1-00-3191 (Ill. App. Ct. 1st Dist. Sept 23, 2002), Ex. A to State Ct. Record [13-1], hereinafter "Direct Appeal Op." at 2.) One of the bullets hit a man named Moatice Williams, who was sitting on his bicycle outside the building, killing him instantly. (*People v. Evans*, No. 97 CR 32176 (Ill. Cir. Ct., Oct. 2, 2011), Ex. F to State Ct. Record [13-3], hereinafter "Post–Conviction Op." at 2.) Chicago Police Officer James Cianella arrived on the scene shortly after the shooting and interviewed two individuals, Margaret Winton and Andrew Jeffers, both of whom witnessed the crime. (Direct Appeal Op. at 2.)

Margaret Winton testified that she was selling socks and towels on the opposite side of the street from Williams at the time of the shooting. (Trial Transcript Vol. II, *People v. Evans*, No. 97 CR 32176, Ex. Q to State Ct. Record [13-8], hereinafter "Tr. Vol. II," at H-35.) She observed Moatice Williams watching Andrew Jeffers and another man named John[2] "pitching

---

[2]    John was never identified beyond his first name, and he did not testify at trial. (Direct Appeal Op. at 5.)

quarters." (*Id.* at H-36.) Winton saw a gray, two-door car with tinted windows and three people inside (whose faces she could not see) drive around the block. (*Id.* at H-37.) About ten minutes later, that same car sped back onto the block and Winton heard seventeen or eighteen shots fired from the car. (*Id.* at H-37–38.)

Officer Cianella interviewed Andrew Jeffers on the night of the shooting and testified that Jeffers described the shooters as three black males, one of whom was wearing a white t-shirt. (*Id.* at H-31.) Jeffers did not identify any of the shooters or provide any other physical descriptions of the shooters. (*Id.*) Officers asked Jeffers to stay and talk to detectives who were *en route* to the scene, but he declined and had disappeared by the time the detectives arrived. (*Id.*)

Chicago Police Department ("CPD") detectives Luis Munoz and William Whalen testified that they spoke to Jeffers almost a year later, in July 1997, when Jeffers was an inmate at the Vienna Correctional Center. (Trial Transcript Vol. III, *People v. Evans*, No. 97 CR 32176, Ex. Q to State Ct. Record [13-9], hereinafter "Tr. Vol. III," at I-51, I-77.) The detectives showed Jeffers a photo array of six persons; three of those photos were of suspects. (*Id.* at I-51.) The detectives testified that Jeffers identified Petitioner and Mario Young as the shooters; the testimony concerning this identification (which is inconsistent with Jeffers's trial testimony, described below) was admissible under Illinois law.[3] (*Id.* at I-52, I-78.) Munoz and Whalen also testified that they, along with Assistant State's Attorney ("ASA") Lorraine Scaduto, visited Jeffers a second time in September 1997 when Jeffers was an inmate at the Du Quoin boot camp facility. (*Id.* at I-55, I-79.) ASA Scaduto testified that during this meeting at Du Quoin, she showed Jeffers photographs of Petitioner and Young and that Jeffers again identified them as

---

[3]     In Illinois, a prior identification is admissible for its truth if "(a) the declarant testifies at the trial or hearing, and (b) the declarant is subject to cross-examination concerning the statement, and (c) the statement is one of identification of a person made after perceiving him." 725 ILCS 5/115-12.

the shooters.[4] (*Id.* at I-15–16.) She also took Jeffers's statement, which she hand-wrote, but Jeffers signed; it was introduced into evidence at trial and read to the jury.[5] (*Id.* at I-10, I-17.)

In that statement, Jeffers said that he was pitching quarters with John at the time of the shooting. (*Id.* at I-19.) A man in his twenties was sitting on a bike and watching them play. (*Id.*) Jeffers bent down to pick up some quarters when he heard shots fired. (*Id.* at I-20.) When he looked up, he saw a gray two-door Oldsmobile with three people inside, two in the front and one in the back. (*Id.* at I-19–20.) The passenger in the back seat was leaning forward and shooting out the window, while the passenger in the front seat was also leaning forward to give the back-seat passenger more room. (*Id.* at I-20.) Jeffers identified the back-seat passenger as Petitioner and the front-seat passenger as Young. (*Id.* at I-21.) Although Jeffers had reportedly ducked down to avoid getting shot, he confirmed in his statement that he had a clear view of the passengers. (*Id.* at I-22.) After the shooting stopped, Jeffers saw that the man sitting on the bike had been shot, so Jeffers ran across the street to call an ambulance. (*Id.*) The next day, Jeffers stated that he was again pitching quarters with John on the 3800 block of West Washington when Evans and Young drove up, this time in a Suburban. (*Id.* at I-23.) According to Jeffers's statement, Petitioner apologized to John for shooting at him the day before and explained that they had mistaken John and the other individuals outside at the time for members of the Traveling Vice Lords gang. (*Id.* at I-24.)

Detective Munoz testified that in December 1997, after Jeffers had been released from boot camp and was placed on house arrest, Munoz brought Jeffers to the police station to view

---

[4]    Mario Young was tried separately from Petitioner. Young was acquitted of first-degree murder and two counts of attempted first-degree murder. (Am. Pet. [33] at 3.)

[5]    A prior inconsistent statement is admissible for its truth in Illinois courts if it "was made under oath at a trial, hearing, or other proceeding" or it is signed by the witness and "narrates, describes, or explains an event or condition of which the witness had personal knowledge." 725 ILCS 5/115-10.1(c).

a lineup, where Jeffers again identified Evans and Young as the shooters. (*Id.* at I-62–64, I-83.) That same day, Jeffers testified before the grand jury. (*Id.* at I-64.) ASA Ann Lorenz testified that she spoke with Jeffers before his appearance in front of the grand jury and discussed with him the prior written statement taken by ASA Scaduto. (*Id.* at I-111–13.) Before Jeffers appeared in front of the grand jury, ASA Lorenz showed Jeffers photos of Petitioner and Young, and Jeffers again identified them as the shooters. (*Id.* at I-113–14.) At trial, ASA Lorenz read Jeffers's grand jury testimony to the jury. (*Id.* at I-121.)

When the prosecution called Jeffers to testify at trial, Jeffers recanted all of his previous statements. (Direct Appeal Op. at 3.) He testified that he did not see a car drive up, did not see the shooters, and did not make the statements attributed to him. (*Id.*) He also claimed he could not recall the content of his grand jury testimony. (Tr. Vol. II at H-121.) Jeffers further denied that he had picked out Evans or Young from a photo array or lineup. (Direct Appeal Op. at 3.) Rather, Jeffers testified that the police told him to "stick with the story," instructing him which photos to select and whom to pick out of the lineup. (Tr. Vol. II at H-164–66.) Jeffers was unable to explain, however, what "story" the police were referencing. (Direct Appeal Op. at 3.) Jeffers further testified that the police had told him "either or" in regards to his written statement and grand jury testimony, which Jeffers interpreted as a threat. (Tr. Vol. II at H-166–68.) But Jeffers could not explain what "either or" meant, the context in which the police said the phrase, or why he interpreted it as a threat. (Direct Appeal Op. at 3.)

On cross examination, Jeffers denied receiving anything from Evans in exchange for his trial testimony, and he testified that neither Evans nor any gang members had threatened him regarding that testimony.[6] (*Id.* at 4; Tr. Vol. II at H-150–51.) Jeffers reiterated this on re-direct, asserting again that no gang member or anyone else had intimidated him regarding his trial

---

[6] On direct examination, the prosecutor does not appear to have suggested that Jeffers had been influenced to recant his testimony. (*See* Tr. Vol. II at H-88–149.)

testimony. (Tr. Vol. II at H-171.) The prosecution then asked Jeffers for the first time whether he had been visited by an investigator working for the other alleged shooter, Young. (*Id.*) Jeffers responded that he had not. (*Id.*) In response to questions by defense counsel on re-cross examination, Jeffers testified that he had spoken to an investigator and did not "stick with the story" when talking to that investigator. (*Id.* at H-175–76.) And then on further re-direct examination, the prosecutor once again asked Jeffers about the investigator and Jeffers testified that he did not know who the investigator was or whom the investigator worked for. (*Id.* at H-176–77.) In addition, Jeffers said that the investigator had not visited his home and that he had told the investigator the "truth"—that he did not see who shot Williams. (*Id.*)

CPD detective Michael Kronin testified at trial regarding gang activity in Chicago, including his observation that, around the time of the shooting, the Unknown Vice Lords gang, also known as the Ghost Town Players, were engaged in a battle over drug-sale territory with the Traveling Vice Lords gang. (Direct Appeal Op. at 7.) Young was a known member of the Unknown Vice Lords, according to Kronin. (*Id.*)

In his initial closing arguments, the prosecutor made no mention of gangs or of Jeffers's alleged conversation with Young's investigator. (*See* Tr. Vol. III at I-149–62.) In the defense closing, counsel argued that Jeffers had not witnessed the events in question and suggested that Jeffers had fabricated the story he gave to authorities while in custody. (*Id.* at I-170, I-178.) Then in rebuttal, the prosecution offered an explanation for Jeffers's inconsistency:

> The police interviewed Andrew Jeffers on the street in front of his house on the block where he lived across the street from where travelling Vice Lords, the gang bangers, sell drugs, where gang bangers dominate the neighborhood, a neighborhood that they come in and ruin, his neighborhood where he lived for five years and where people would know him.
>
> Minutes after he saw a man get gunned down by these people in cold blood and police interview him on the scene in that situation in that environment, is anybody at all surprised that Andrew Jeffers would not make the identifications in that situation?

(*Id.* at I-182). The prosecutor theorized that Jeffers had given a more complete story when he was in custody because he was "away from the street where the gang bangers dominate, from the place where he lived when he saw Moatice Williams get gunned down by this guy, Julius Evans." (*Id.* at I-184.) Then, the prosecutor went on to assert, after Jeffers had received a visit from codefendant Young's investigator, Jeffers changed the story he provided to police because he realized Petitioner and Young knew where to find him:

> [Jeffers] had identified them in photos in the Grand Jury. It only changed after he was released from custody when lo and behold he gets a visit from an investigator working for the lawyer for Mario Young, the defendant's co-offender. . . . An investigator comes to visit him, and that person apparently interviews Andrew Jeffers. For what purpose? You can draw your own conclusion. Andrew Jeffers now knows when the investigator visits him they know how to find him. . . . They know where he is at. The gang bangers that executed Moatice Williams on the street right next to him know how to find Andrew Jeffers. They can come see him whenever they want. . . . What a surprise that Andrew Jeffers after being visited by Mario Young's investigator would suddenly forget everything that he saw. . . . You can draw your own conclusions. Andrew Jeffers now knows that Mario Young or his investigator knows how to find Andrew Jeffers.

(*Id.* at I-187–89.)

In addition to calling Petitioner a "gang banger," the prosecutor asserted that the shooting had been motivated by gang violence:

> [Evans and Young] were trying to shoot Travelling Vice Lords because there was a conflict going on on that block between them and the Travelling Vice Lords, and because they came there that night to shoot Travelling Vice Lords and because as usual as they usually do they hit the wrong person.
>
> . . .
>
> The evidence in this case shows that [Moatice Williams] was gunned down in cold blood by this defendant, Julius Evans. It was over some silly nonsensical gang drug territory conflict. This defendant and his buddy, Mario Young . . . drove up in a car and Mario Young, whose gang was in conflict with the gang selling drugs at that territory at that time this defendant opened fire.

(*Id.* at I-196, I-199–200.)

The jury found Petitioner guilty of first-degree murder. In his post-trial motion for a new trial, Petitioner objected to the prosecutor's closing comments that Young's investigator had visited Jeffers and argued that these comments prejudiced the jury against Petitioner. (*Id.* at K-3–7.) After denying Petitioner's motion, the trial court sentenced Petitioner, who had by then been sentenced to 50 years for an unrelated murder, to a term of natural life in prison. (*Id.* at K-8, K-12.)

**Direct Appeal**

Petitioner appealed to the Appellate Court of Illinois, First District, making two arguments: that the state engaged in prosecutorial misconduct in closing arguments by: (1) implying that Young's investigator caused the witness Andrew Jeffers to recant his earlier statements; and (2) "unfairly play[ing] on the jury's fear and loathing of street gangs." (Direct Appeal Op. at 1; Pet. Direct Appeal Br. [13-1] at 2.) In a written order dated September 23, 2002, the Appellate Court affirmed the conviction. (Direct Appeal Op. at 1.) Regarding the prosecutor's closing statements concerning Jeffers's meeting with an investigator, the Appellate Court determined that "the State made a reasonable inference [of witness intimidation] from the evidence which demonstrated that Jeffers dramatically changed his testimony at trial after receiving a visit from an investigator sent by codefendant Young, a known gang member." (*Id.* at 13–14.) The Appellate Court also construed Jeffers's testimony as showing that "Jeffers admitted that he did, in fact, meet with [Young's] investigator." (*Id.* at 14.) With respect to the prosecutor's gang-related closing statements, the court found that Petitioner had waived any argument regarding these statements because he did not raise the claim in his post-trial motion. (*Id.* at 16.) The court went on, however, to conclude that Petitioner's appeal would also fail on the merits because the evidence established that Petitioner participated in gang activity and therefore the comments were proper. (*Id.* at 16–18.)

Petitioner raised the same two prosecutorial misconduct arguments in his petition for leave to appeal to the Supreme Court of Illinois. (Petition for Leave to Appeal, Ex. E to State Ct. Record [13-2] at 3.) On December 5, 2002, the Illinois Supreme Court denied the petition without comment. *See People v. Evans*, 202 Ill. 2d 628, 787 N.E.2d 161 (Ill. 2002).

**Post-Conviction Proceedings**

Petitioner filed a *pro se* petition for post-conviction relief with the trial court on May 29, 2003. (Petition for Post-Conviction Relief, Ex. G to State Ct. Record [13-3] at 1.) In his petition, Petitioner argued that he was denied the right to a fair trial and effective assistance of counsel because his trial attorney failed to object to the prosecutor's improper closing arguments. Post-conviction counsel was appointed, but counsel chose to make no amendments to the petition. (Post-Conviction Brief, Illinois Court of Appeals [13-4] at 10.) The state moved to dismiss the petition, and the trial court granted that motion on October 2, 2011, finding that Petitioner had waived his ineffective assistance of trial counsel and trial court error claims by failing to raise them on direct appeal. (Post-Conviction Order, Illinois Circuit Court, Oct. 2, 2011, Ex. G to State Ct. Record [13-3] at 4–5.) Even if not waived, the court concluded that his claims lacked merit because they were "conclusory and devoid of supporting facts." (*Id.* at 5.) With respect to Petitioner's ineffective assistance of appellate counsel claim, the court held that Petitioner had failed to meet the test set forth in *Strickland v. Washington*, 466 U.S. 668 (1984).

Through newly appointed counsel, Petitioner appealed, arguing that his post-conviction counsel had failed to provide reasonable assistance under Illinois Supreme Court Rule 651(c), primarily for deciding not to obtain affidavits from witnesses or transcripts from his co-defendant's trial. (Post-Conviction Order, Illinois Court of Appeals, Dec. 13, 2013, Ex. G to State Ct. Record [13-3] at 1.) The Illinois Appellate Court affirmed the dismissal in an unpublished order, holding that Petitioner had failed to rebut the presumption of reasonable assistance. (*Id.* at 5.)

After his petition for leave to appeal was denied by the Illinois Supreme Court, Petitioner filed a habeas petition with this court pursuant to 28 U.S.C. § 2254. (Petition [1].) In his petition, Evans argued that he was denied effective assistance of post-conviction counsel and that the prosecutor's closing arguments deprived him of due process by unfairly playing on the jury's fear of gangs and incorrectly suggesting that Petitioner had caused the government's key witness to recant earlier-made statements. (*Id.* at 5.) This court recognized that the ineffective assistance claim was not cognizable on federal habeas review, *Evans v. Butler*, No 14 C 3930, 2016 WL 3633315, at *12, but concluded that the prosecutorial misconduct claims raised serious concerns, and appointed counsel to investigate and brief those claims. *Id.*

## DISCUSSION

"[A] district court shall entertain an application for a writ of habeas corpus in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). Federal review of state convictions is limited by "two fundamental tenets": First, a district court may review the merits of a petition only if the petitioner has exhausted all remedies available in state courts. 28 U.S.C. § 2254(b)(1)(A). "Second, a federal court may not review federal claims that were procedurally defaulted in state court—that is, claims that the state court denied based on an adequate and independent state procedural rule." *Davila v. Davis*, 137 S. Ct. 2058, 2064 (2017).

When a federal court does review the merits of a habeas petition, it does so with a "presumption that state courts know and follow the law." *Woodford v. Visciotti*, 537 U.S. 19, 24 (2002). A federal court may issue a writ of habeas corpus only if the state court's judgment "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light

10

of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d). The clearly established law that applies to claims for improper statements made by a prosecutor is *Darden v. Wainwright*, 477 U.S. 168 (1986).[7] *See Parker v. Matthews*, 567 U.S. 37, 45 (2012) ("The 'clearly established Federal law' relevant here is our decision in *Darden*."); *Howard v. Gramley*, 225 F.3d 784, 793 (7th Cir. 2000) ("The leading Supreme Court decision on the question whether prosecutorial misconduct is so egregious that a new trial is required, as a matter of constitutional law, is *Darden*."). Under *Darden*, 477 U.S. at 181, a petitioner must demonstrate both (1) that the prosecutor's statements were improper and (2) that those statements deprived him of a fair proceeding.

With respect to *Darden*'s first prong, Respondent argues that there is no clearly established law, as determined by the Supreme Court, that could render the prosecutor's statements improper. But Petitioner claims that the prosecutor's remarks were inflammatory and not based in evidence, and the Court has said that inflammatory comments can be improper, *see, e.g., id.* at 179–80 (stating that it was improper for the prosecutor to, for example, refer to the defendant as an animal or "impl[y] that the death penalty would be the only guarantee against a future similar act"), as can statements that are not supported by evidence, *see, e.g., Berger v. United States*, 295 U.S. 78, 84–85 (1935) (finding as inappropriate the prosecutor's misstating facts not supported by evidence, among other errors). Respondent also contends that the state appellate court's determination that the prosecutor's statements were not improper is a finding of fact that the court must presume is correct unless rebutted by clear and convincing evidence. *See* 28 U.S.C. § 2254(e)(1). On this point, Respondent is on firmer ground: the state appellate court's determination that the prosecutor's remarks were supported

---

[7]     As the court noted in its July 2016 order, although the state appellate court did not specifically discuss *Darden*, that is not dispositive of whether the standard set forth in *Darden* was violated. *See* 28 U.S.C. § 2254(d); *Ruvalcaba v. Chandler*, 416 F.3d 555, 565 (7th Cir. 2005) (applying *Darden* even though "the state court did not cite *Darden*").

by the evidence "will not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the state-court proceeding." *Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003). The court's review of the prosecutor's statements under *Darden*'s first prong will be deferential. Still, the court notes that this is not an insurmountable bar. *See id.* ("Even in the context of federal habeas, deference does not imply abandonment of judicial review. Deference does not by definition preclude relief.").

As for *Darden*'s second prong, "[t]he relevant question is whether the prosecutor['s] comments so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Ruvalcaba*, 416 F.3d at 565 (quoting *Darden*, 477 U.S. at 181). In evaluating whether the petitioner was prejudiced by the prosecutor's improper statements, a court should consider the following factors: "(1) whether the prosecutor misstated the evidence, (2) whether the remarks implicate specific rights of the accused, (3) whether the defense invited the response, (4) the trial court's instructions, (5) the weight of the evidence against the defendant, and (6) the defendant's opportunity to rebut."[8] *Howard*, 225 F.3d at 793.

## I.    Closing Statements regarding Petitioner's Gang Affiliations

Petitioner claims that the prosecutor's closing statements that he had affiliations with or was a member of a gang constituted prosecutorial misconduct. Before analyzing whether these statements were improper or prejudiced Petitioner, the court addresses Respondent's arguments that this claim was not exhausted and has been procedurally defaulted.

---

[8]    In addition to arguing that these *Darden* factors do not favor granting Petitioner habeas relief, Respondent also asserts that the prosecutor's remarks, even if improper, still amounted only to harmless error. As another court in this district has noted, however, "[b]ecause finding a constitutional error under the *Darden* framework includes a finding of prejudice, no independent finding that the constitutional error had a 'substantial and injurious effect or influence in determining the jury's verdict' is needed." *Clark v. Lashbrook*, No. 14-CV-03936, 2017 WL 680316, at *21 n.16 (N.D. Ill. Feb. 21, 2017) (Tharp, J.) (quoting *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993)); *cf. Kyles v. Whitley*, 514 U.S. 419, 435 (1995) (holding that when a court finds a constitutional error under the test put forth in *United States v. Bagley*, 473 U.S. 667 (1985), no harmless error inquiry is required).

## A.    Exhaustion and Procedural Default

Respondent previously conceded that Petitioner had satisfied the exhaustion requirement for this claim. (Answer [12] at 5.) Respondent now argues, however, that Petitioner in fact never raised this claim in a prior state court proceeding.

On direct appeal, Petitioner's brief highlighted the following quote from the prosecutor's rebuttal closing argument:

> [The defendants] were trying to shoot Travelling [sic] Vice Lords because there was a conflict going on on that block between them [the defendants] and the Travelling [sic] Vice Lords and because they came there that night to shoot Travelling [sic] Vice Lords <u>and because as usual they [gangs] usually do hit the wrong person</u>.

(Pet. Direct. Appeal Br., Ex. B to State Ct. Record [13-1] at 16 (alterations in original).) This was the only quote from the prosecutor's rebuttal closing argument that Petitioner included in the portion of his appellate brief dedicated to this issue. (*See id.* at 16–18.) Respondent contends that in referring to this quote alone, Petitioner did not argue, as he does here, that the prosecutor unfairly characterized him as a "gang banger" or said that the shooting was gang-related.

A claim has satisfied § 2254's exhaustion requirement when it has been adequately presented through one complete round of state-court review. *See Pole v. Randolph*, 570 F.3d 922, 934 (7th Cir. 2009). "Adequate presentation of a claim requires the petitioner to assert both the operative facts and the legal principles that control each claim." *Id.* For example, in *Pole*, 570 at 926, the petitioner claimed that he was entitled to habeas relief from his first-degree murder and armed robbery convictions because his attorney committed five errors at trial that rendered his legal assistance ineffective. The Seventh Circuit concluded that the petitioner had raised just three of those errors in state court proceedings; thus, the other two were forfeited. *Id.* at 936–40. The court noted, "if a petitioner fails to assert in the state courts a particular

factual basis for the claim of ineffective assistance, that particular factual basis may be considered defaulted." *Id.* at 935.

But when determining whether a petitioner has "placed both the operative facts and the controlling legal principles before the state courts," the Seventh Circuit has cautioned "that federal courts should 'avoid hypertechnicality.'" *Boyko v. Parke*, 259 F.3d 781, 788 (7th Cir. 2001) (quoting *Verdin v. O'Leary*, 972 F.2d 1467, 1474 (7th Cir. 1992)). In fact, "[a] petitioner may reformulate his claims somewhat, so long as the substance of his argument remains the same." *Id. Ward v. Jenkins*, 613 F.3d 692 (7th Cir. 2010), is illustrative of this principle. In that case, the Seventh Circuit noted that the petitioner's postconviction motion "did not provide a highly detailed factual basis for [his attorney's] alleged deficient conduct or a precise account of how that conduct prejudiced [him]," and that the argument in the habeas petition was "more developed than it was before the state court." *Id.* at 697. Nevertheless, the petitioner had not defaulted this claim because he had provided "enough detail to have sufficiently alerted the state court to his federal constitutional claim." *Id.*

This court finds that Petitioner has exhausted his claim regarding the prosecutor's statements about his gang affiliations. Petitioner has done no more than add additional details to his habeas petition to support this claim; he is not asserting a new claim.[9] That the state court noted that "there was ample evidence of gang motivation presented at trial" and that evidence "establish[ed] that defendant was participating in gang activity" confirms that the state court had been alerted to the substance of this claim. (Direct Appeal Op. at 16–17.) Cases that Respondent cites in arguing that Petitioner's claim has not been exhausted are distinguishable. *United States ex rel. Howard v. Uchtman*, No. 04 C 2185, 2005 WL 1498851, at *4–5 (N.D. Ill.

---

[9]     Respondent also argued that, as a "new" claim, this claim failed to satisfy the one-year limitations period provided in 28 U.S.C. § 2244(d)(1). Because the court finds that this is not a new claim but was presented to the state court on direct appeal, it is also timely.

May 19, 2015), for instance, held that challenges to three of four remarks by a prosecutor were defaulted because the petitioner failed to include them in his petition for leave to appeal. But each of the four challenges was factually distinct from the other three: while the petitioner had appropriately exhausted his claim that the prosecutor committed misconduct by saying that the petitioner's indictment could be considered as evidence of his guilt, he had not exhausted his claim that the prosecutor committed misconduct by likening him to John Wayne Gacy. *Id.* at *3. Petitioner Evans's challenge to the prosecutor's statements regarding his gang affiliation is just one claim; merely adding more factual support than presented in state court does not render it a new claim. Therefore, this claim has been exhausted. *See also Wilks v. Israel*, 627 F.2d 32, 38 (7th Cir. 1980) ("[M]ere variations in the same claim rather than a different legal theory will not preclude exhaustion.").

Nor was this claim procedurally defaulted. This court so held in its July 2016 order, *see Evans*, 2016 WL 3633315, at *8, but Respondent asks that the court revisit this issue, arguing once again that the state court's determination that Petitioner had forfeited this claim rested on an independent and adequate state law ground. But the court stands by its conclusion that the state court's opinion lacked the kind of "plain statement" required to bar federal habeas review *Harris v. Reed*, 489 U.S. 255, 262–63 (1989); *see Jenkins v. Nelson*, 157 F.3d 485, 491 (7th Cir. 1998) ("[I]n order to foreclose review on habeas, the state court must actually state in plain language that it is basing its decision on the state procedural default and that other grounds are reached only in the alternative.").

It is true that the state court began its analysis by noting that "[i]t is well settled [in Illinois] that, to preserve an issue for review, a defendant must both object at trial and specifically include the objection in a post-trial motion" and that "[b]ecause defendant failed to properly preserve the issue he now raises, it is waived on appeal." (Direct Appeal Op. at 16.) The state court's analysis did not end there, however. Instead, it spent the rest of its opinion discussing

the merits of the claim, concluding that the prosecutor's "argument was proper" because "there was ample evidence of gang motivation at trial" and the evidence also "establish[ed] that defendant was participating in gang activity." (*Id.* at 16–18.) As the court noted in its July 2016 order, the state court's opinion is similar to that at issue in *Harris*, 489 U.S. at 266, where the Supreme Court held that federal habeas review was not barred because the state court opinion, which analyzed the petitioner's claim under both state and federal law, had "fall[en] short of an explicit reliance on a state-law ground." *See also id.* at 266 n.13 ("While it perhaps could be argued that this statement would have sufficed had the state court never reached the federal claim, the state court clearly went on to reject the federal claim on the merits. As a result, the reference to state law in the state court's opinion is insufficient to demonstrate clearly whether the court intended to invoke . . . an alternative ground."). This case also differs from those that Respondent cites, such as *Holmes v. Hardy*, 608 F.3d 963, 967 (7th Cir. 2010), in which the state court had not decided the substantive claims, or *Smith v. McKee*, 598 F.3d 374, 383 (7th Cir. 2010), in which the state court had addressed the merits only because the merits served as a component of its procedural analysis. Petitioner's claims are properly before this court.

B. ***Darden* Analysis**

In accordance with *Darden*, before considering whether Petitioner was prejudiced by the comments, the court must consider whether it was unreasonable for the state appellate court to find that the prosecutor's statements were proper.

Petitioner has highlighted the following statements made by the prosecutor during rebuttal closing arguments, claiming that they were improper because they were not based in evidence and inflammatory because they suggest that Petitioner was affiliated with a gang:

- "[T]he block where these guys [Evans and Young] had gunned down Moatice Williams, the block where *the rival gang*, the Travelling Vice Lords, sell drugs and make their money." (Tr. Vol. III at I-183.)

- "[H]e [Jeffers] gained having to spend the rest of his life knowing that he identified two people *in a gang-related murder*." (*Id.* at I-193.)

- "Th[e] reason this law exists is because of things that happen to people like Andrew Jeffers after they make identifications of *gang bangers*…" (*Id.* at I-189.)

- "The *gang bangers* that executed Moatice Williams on the street right next to him [Jeffers] know how to find him" (*Id.* at I-187.)

- "[The defendants] were trying to shoot Traveling Vice Lords because there was a conflict going on on that block between them [the defendants] and the Traveling Vice Lords and because they came there that night to shoot Traveling Vice Lords and because as usual they [gangs] usually do hit the wrong person." (*Id.* at I-196.)

Respondent counters that there was evidence that the shooting was indeed gang-related and that Petitioner was a "gang banger." The Illinois Appellate Court agreed that "there was ample evidence of gang motivation presented at trial," including Jeffers's prior statements and the testimony of a gang crimes specialist. (Direct Appeal. Op. at 16–17.) The state court concluded: "[a]lthough this evidence does not unequivocally prove that defendant was a gang member, it does establish that defendant was participating in gang activity, specifically a drive-by shooting, with a known gang member and that the shooting was motivated by gang rivalry." (*Id.* at 16–17.) This conclusion does not appear to be objectively unreasonable.

Three items of evidence are relevant: First, in his September 1997 statement to the police, which was admitted into evidence for its truth, Andrews Jeffers recalled that he saw Petitioner and Mario Young pull up to 3843 West Washington in a gray Oldsmobile and that Young, seated in the passenger seat, leaned forward so Petitioner could shoot from the back seat. (Tr. Vol. III at I-17, I-20–21.) That statement also recounts that Petitioner and Young returned to 3843 West Washington the following day and that Petitioner apologized for the shooting and explained that "they thought that Traveling Vice Lords were going to be on that side of the street and that's why they shot at them." (*Id.* at I-23–24.) Second, in his December

1997 grand jury testimony, also admitted for its truth, Jeffers made these same points about what he witnessed on the day of the shooting and the day after. (*Id.* at I-121, I-124–25, I-127–29.) Third, Michael Kronin, a CPD gang specialist, testified that Young was a member of the Unknown Vice Lords gang and that, at the time of Moatice Williams's murder, the Unknown Vice Lords were in conflict with the Traveling Vice Lords, which sold drugs at 3845 West Washington. (*Id.* at I-104–106.) The Illinois Appellate Court relied on these three items of evidence and Respondent now emphasizes them in arguing that the prosecutor's statements were not improper.

Petitioner urges, however that no evidence at trial directly connected him to a gang, and that the only evidence that Petitioner even knew Young came from statements and testimony that Jeffers recanted. Furthermore, Petitioner contends that the evidence did not support a reasonable inference that Petitioner was affiliated with a gang. The court notes, however, Kronin's testimony that Young was a member of the Unknown Vice Lords, that that gang was in conflict with the Traveling Vice Lords, and that the latter sold drugs very near where the shooting occurred. Moreover, Jeffers's prior statements both identified Petitioner as having shot Williams from a car with Young and described Petitioner's subsequent apology and explanation that members of the Traveling Vice Lords were the real target. On this record, the state court's finding that the prosecutor's statements were not improper is not objectively unreasonable. *See also, e.g., United States v. Olson*, 450 F.3d 655, 674 (7th Cir. 2006) (finding that a prosecutor's statement was not improper because it was supported by "a fair inference . . . from the evidence as a whole" even though no evidence supported it directly). At trial, Jeffers recanted his previous statement and grand jury testimony, but whether his earlier statements were to be believed or disregarded was a matter for the jury to decide. *See United States v. Ridley*, 826 F.3d 437, 442 (7th Cir. 2016) ("Where plausible . . . witness testimony conflicts, it is the jury's role to resolve those conflicts); *United States v. Hodges*, 315 F.3d 794, 799 (7th Cir. 2003)

18

("The jury . . . is free to credit witnesses and resolve any inconsistencies in their testimony however it sees fit, and we will not disturb their credibility findings.").

Petitioner also argues that the prosecutor's statements were improper because they were inflammatory. Our Court of Appeals recognizes that statements about or evidence concerning a criminal defendant's gang affiliation can be troubling: "There is no question that evidence of a defendant's gang affiliation is potentially prejudicial and inflammatory, as it poses the risk that the jury will associate gang membership with a propensity for committing crimes and find the defendant guilty by association." *United States v. Ozuna*, 674 F.3d 677, 681 (7th Cir. 2012); *see also United States v. Harris*, 587 F.3d 861, 867 (7th Cir. 2009) (noting that because of the risk of prejudice, the Seventh Circuit "ha[s] asked district courts to consider carefully whether to admit evidence of gang membership and gang activity in criminal prosecutions"). Nonetheless, "so long as the evidence supports the comments, prosecutors may speak harshly about the actions and conduct of the accused." *United States v. Durham*, 211 F.3d 437, 440 (7th Cir. 2000); *see also id.* (concluding that it was not improper for a prosecutor to refer to a defendant as a "slick little dope dealer" who "uses kids and exploits them to peddle poison" because the evidence supported that comment). While Petitioner is correct that the prosecutor spoke harshly of him during rebuttal closing arguments, the evidence supported an inference that Petitioner had a gang affiliation. Though the statements raised the risk of inflaming the jury's passions, the court cannot conclude that the state court's conclusion concerning their propriety was unreasonable. The court therefore need not address the second prong of the *Darden* analysis.

## II.    Closing Statements regarding Witness Intimidation

Petitioner's second claim concerns the prosecutor's statements that Jeffers recanted his prior statement and grand jury testimony because he had been intimidated by an investigator working for Mario Young. This claim has been exhausted and is not procedurally defaulted, and

Respondent has not argued otherwise, so the court turns to the merits. In accordance with *Darden*, the court first asks whether the state court's finding that these statements were proper is a reasonable one; if not, the court will then consider whether Petitioner was prejudiced by the improper statements.

### A.    *Darden*'s First Prong

On several occasions during rebuttal closing argument, the prosecutor stated or implied that Jeffers recanted his earlier statements because he had been intimidated by an investigator hired by Mario Young. For example:

- "What a surprise that Andrew Jeffers after being visited by Mario Young's investigator would suddenly forg[e]t everything that he saw." (Tr. Vol. III at I-188.)

- "That's why Andrew Jeffers was such a pain when he was on the witness stand yesterday. You can draw your own conclusions. Andrew Jeffers now knows that Mario Young or his investigator knows how to find Andrew Jeffers." (*Id.* at I-188–89.)

- "[Jeffers's story] was always consistent. The only time it changed was after he was visited by Mario's [sic] Young's investigator." (*Id.* at I-191.)

- "The testimony is that Andrew Jeffers was one hundred percent sure and entirely consistent in his identifications of what happened and who he saw do it. As I said until he was paid a visit by Mario Young's investigator." (*Id.* at I-197.)

Petitioner argues that such statements were improper because the evidence presented at trial did not establish either that Jeffers recanted his prior statements because he was intimidated by the investigator or that the investigator worked for Young. Respondent counters that Jeffers's testimony at trial confirmed that the investigator worked for Young and that the prosecutor never explicitly argued that Jeffers had been intimidated but properly left it for the jury to infer why Jeffers changed his story based on the timing of the investigator's visit. Likewise, the Illinois Appellate Court held that these statements were not improper because the prosecutor did not overtly argue that Young or Petitioner had intimidated Jeffers and because, the court believed,

Jeffers had testified that he was visited by an investigator working for Young.    (Direct Appeal

Op. at 13–15.)

Contrary to Respondent's assertions and the state court's opinion, Jeffers's testimony at

trial did not identify the investigator as working for Young.    On re-direct examination, the

prosecutor twice asked Jeffers if an investigator working for Young had visited him and Jeffers

twice said no:

(by the Prosecutor)

Q.    But after you were released from boot camp you got a visit from someone working for Mario Young, the co-defendant, didn't you?

A:    No.

Q:    Didn't an investigator working for Mario Young's lawyer come to your home and ask you questions about what happened and talk to you about the shooting?

A:    No.

(Tr. Vol. II at H-171.)  Similarly, on re-cross examination, Jeffers admitted that he spoke to an

investigator about the case but denied knowing whether that investigator worked for Young.

Jeffers also testified that he told the investigator what he actually witnessed—not the story the

police had told him to "stick" to:

(by Defense counsel)

Q:    The State's Attorney asked you if you spoke to an investigator when you were out for Mr. Young. Have you spoke to one, sir, is that correct?

A:    Who?

Q:    The state's attorney just asked you if you spoke to an investigator for Mario Young when you were released from custody, is that correct, sir?

A:    When I was released from custody.

Q:    Right, when you were out.

A:    Right.

Q:     And did you tell them, did you stick with the story with the investigator, sir?

A:     No.

Q:     Pardon me, sir?

A:     No.

. . .

Q:     So you didn't tell that person what you told the grand jury, correct?

A:     Yeah.

Q:     Because you didn't stick with the story?

A:     Right.

Q:     And you didn't tell that person what is written in People's [Exhibit] 20 [Jeffers's September 2017 statement], is that correct, sir?

A:     Correct.

Q:     Because you didn't stick with the story?

A:     Uh-huh.

Q:     And didn't you tell that person what you told [Detectives] Whalen and Munoz back in July while you were in Vienna [Correctional Center] because you didn't stick with the story, correct?

A:     No.

Q:     You told your version, is that correct, sir?

A:     Yes.

(*Id.* at I-174–76.) Finally, on further direct examination, the prosecutor asked Jeffers more questions about the investigator, but Jeffers once again denied knowing whether she was employed by Young:

(by the Prosecutor)

Q:     I thought you just said you don't remember being visited by an investigator for Mario Young, the co-defendant, after you were released from custody; didn't you just say that ten minutes ago?

A:      You asked me if she came to my house.

Q:      Who is it that came and visited you?

A:      Didn't no one come to my house.

Q:      Where did they visit you at?

A:      I don't remember. She didn't come to my house.

Q:      But you don't remember where?

. . .

A:      Whoever she was, she didn't come to my house, whatever you say.

Q:      But you know it was an Investigator who worked for Mario Young, the defendant in this case, didn't you?

A:      No.

Q:      You didn't know that?

A:      No.

Q:      Who did you think it was?

A:      I don't know who it was. She just asked me questions and I talked to her.

Q:      Asked you questions about the shooting, right?

A:      Yeah.

Q:      And that is when you decided to start saying that you didn't see who did the shooting, right?

A:      I told her the truth.

(*Id.* at I-176–77.)

In addition, Jeffers also testified during cross-examination that neither Petitioner nor any gang member had made any effort to get him to change his testimony:

(by Defense counsel)

Q:      Now, before we continue, Julius Evans didn't tell you to come here today to testify, did he?

A:      No.

23

Q:      And Julius Evans did not offer you anything in exchange for your testimony, did he?

A:      No.

Q:      And he didn't direct any threats to you or your family, did he, in any way to you to try to change your testimony, correct?

A:      Correct.

Q:      Now, you've already said you're not in a gang. No gang members threatened you to try to alter your testimony, correct?

A:      Correct.

Q:      So that would mean no Traveling Vice Lords told you to come here and say what you said, correct?

A:      Correct.

Q:      And no Unknown Vice Lords have tried to influence your testimony in any way, correct?

A:      Correct.

(*Id.* at H-150–51.) Jeffers reiterated this on redirect examination:

(by the Prosecutor)

Q:      It's your testimony today that no gang members or no one intimidated you into giving this testimony, is that right?

A:      Right.

(*Id.* at H-171.)

This testimony establishes only that Jeffers spoke to an investigator about the case—not that the investigator worked for Young or that the investigator intimidated Jeffers. Nonetheless, the Illinois Appellate Court found that the prosecutor's comments were supported by the record: "Jeffers testified on examination by the State that he did not speak to an investigator sent by codefendant Young. Yet, on cross examination by defense counsel, Jeffers admitted that he did, in fact, meet with this investigator." (Direct Appeal Op. at 14.) But Jeffers did no such thing; he specifically denied knowing whether the investigator worked for Young. And no other

24

evidence presented at trial connected the investigator to Young. Furthermore, although the state court said that Jeffers never testified "whether he was threatened by the investigator" (*id.* at 15), the prosecutor had asked Jeffers that "[i]t's your testimony today that no gang members *or no one* intimidated you into giving this testimony, is that right?" and Jeffers replied "[r]ight." (Tr. Vol. II at H-171 (emphasis added).)

The state court's conclusion that the prosecutor's comments were proper does not appear to be reasonable; those comments were not supported by trial evidence, nor were they based on a reasonable inference of the evidence. The prosecution's suggestion that an investigator hired by Young intimidated Jeffers incorrectly represented the evidence. Such statements were not only improper, *see, e.g., United States v. Alviar*, 573 F.3d 526, 542 (7th Cir. 2009) ("[A] prosecutor may not imply facts not before the jury lend a witness credibility."), but also potentially prejudicial, *see United States v. Thomas*, 86 F.3d 647, 654 (7th Cir. 1996) (quoting *United States v. Guerrero*, 803 F.2d 783, 785 (3d Cir. 1986) (threat or intimidation "appeals to the jury's sympathies, arouses a sense of horror, provokes its instinct to punish, or otherwise may cause a jury to base its decision on something other than the established propositions in the case").

### B. *Darden*'s Second Prong

The court therefore turns to the second prong of the *Darden* analysis: whether the prosecutor's improper statements prejudiced Petitioner. The Seventh Circuit has said that a court should consider the following six factors when evaluating prejudice: "(1) whether the prosecutor misstated the evidence, (2) whether the remarks implicate specific rights of the accused, (3) whether the defense invited the response, (4) the trial court's instructions, (5) the weight of the evidence against the defendant, and (6) the defendant's opportunity to rebut." *See Howard*, 225 F.3d at 793. Although these factors should "not [be] applied in a rigid manner," the

Seventh Circuit has said that the fifth factor—the weight of the evidence—is most important. *Rodriguez v. Peters*, 63 F.3d 546, 558 (7th Cir. 1995).

Not all of these factors favor Petitioner. It is not clear that any of his "specific rights" were implicated by the prosecutor's remarks. Petitioner correctly asserts that his right to the assistance of counsel includes the right to engage in an investigation, *see Michigan v. Harvey*, 494 U.S. 344, 348 (1990), but that right was not implicated here; the prosecutor's comments concerned an investigator purportedly hired by the other alleged shooter, Young. Those statements thus implicated Young's right—not Petitioner's. If it was improper for the prosecutor to suggest that the investigator must have intimidated Jeffers because a gang member (Young) had hired him, that impropriety still directly implicates only Young's right to investigate the case. *See also Dunnet Bay Constr. Co. v. Borrgren*, 799 F.3d 676, 689 (7th Cir. 2015) ("[A] litigant 'generally must assert his own legal rights and interests' and cannot assert 'the legal rights or interests of third parties.'") (quoting *Warth v. Seldin*, 422 U.S. 490, 499 (1975)); *cf. United States v. Friedman*, No. 15 CR 675-2, 2018 WL 1695370, at *6 (N.D. Ill. Apr. 6, 2018) (noting that the defendant "cannot advance someone else's claim of ineffective assistance"). True, the prosecution's theory was that Young and Petitioner had acted in concert to kill Williams. But the right to investigate is based in the Sixth Amendment's right to assistance of counsel. *See Harvey*, 494 U.S. at 348. That right is a "personal" one, *Faretta v. California*, 422 U.S. 806, 820 (1975), and thus cannot be asserted vicariously. *Friedman*, 2018 WL 1695370, at *6.

The court also notes that the trial court properly instructed the jury—before, during, and after closing arguments—to disregard attorney statements that were not based in evidence. (Tr. Vol. III at I-149, I-167, I-204.) As this court observed earlier, *Evans*, 2016 WL 3633315, at *10, the court presumes that the jury followed these instructions. *United States v. Bermea-Boone*, 563 F.3d 621, 625 (7th Cir. 2009). Petitioner contends that the prosecutor's comments about Young's investigator intimidating Jeffers were so inflammatory that the trial court was obligated

26

to issue specific instructions to the jury concerning these improper statements. Indeed, the presumption that jurors abide by the trial court's instructions can be overcome when "the matter before them is so powerfully incriminating that they cannot reasonably be expected to put it out of their minds," *United States v. Smith*, 308 F.3d 726, 739 (7th Cir. 2002), and evidence about witness intimidation can be powerfully incriminating. *See United States v. Thomas*, 86 F.3d 647, 653 (7th Cir. 1996) ("[W]e have cautioned courts regarding the admission of threat evidence to assess witness credibility."). The prosecutor's improper comment in this case was not as inflammatory as those in *Donnelly v. DeChristoforo*, 416 U.S. 637, 644 (1974), however, where the prosecutor remarked on defendant's offer to plead guilty. And while the trial court's curative instructions were not as detailed as those given in *United States v. Morgan*, 113 F.3d 85, 88 (7th Cir. 1997), or provided as immediately after the improper statement as in *United States v. Gonzalez*, 933 F.2d 417, 431 (7th Cir. 1991), the trial court did repeatedly instruct the jury to ignore attorney statements not based in fact.

The remaining *Darden* factors more clearly support Petitioner's claim. As discussed above, the prosecutor's statements misstated the evidence by asserting, repeatedly, that Jeffers had been visited by an investigator working for Mario Young, the other alleged shooter. There was in fact no evidence connecting the investigator who spoke with Petitioner to Young. Moreover, the prosecutor repeatedly asserted that Jeffers had recanted his earlier statements because he was intimidated by this investigator. But that also was not supported by the evidence: Jeffers testified that he had not been intimidated or influenced by anyone.

Other factors support Petitioner's claim, as well. The troublesome statements were made in the prosecutor's rebuttal closing, to which Petitioner had no opportunity to respond. Nor did defense counsel invite the prosecutor's improper remarks. The "invited response" doctrine requires the court, "when assessing the prejudicial effect of a prosecutor's improper statements, . . . consider the comments in the context of the whole trial, accounting for any

27

mitigating circumstances such as improper statements from the defense that might have disposed the jury to favor the defendant's position." *United States v. Alexander*, 741 F.3d 866, 871 (7th Cir. 2014). In essence, the question is whether "[t]he prosecutor's misconduct may just have offset the defense counsel's misconduct, thus producing no net effect on the jury's deliberations." *United States v. Mazzone*, 782 F.2d 757, 763 (7th Cir. 1986). Respondent asserts that Petitioner invited the prosecutor's improper comments in that Jeffers claimed at trial that police coerced him (Tr. Vol. II at H-166–69), and defense counsel argued (in his opening and closing remarks) that Jeffers's initial statements were coerced by the police. (*Id.* at H-20–23; Tr. Vol. III at I-163–69). But defense counsel's comments that Jeffers had been coerced were not improper because they were supported by some evidence (Jeffers's own trial testimony). There was no defense counsel misconduct that needed to be offset by prosecutorial misconduct. In short, nothing defense counsel said at trial invited the prosecutor to state— without evidence—that the investigator who spoke to Jeffers had been hired by Young and intimidated Jeffers.

The "most important" of the *Darden* factors is the weight of the evidence; "'[s]trong evidence of guilt eliminates any lingering doubt that the prosecutor's remarks unfairly prejudiced the jury's deliberations.'" *United States v. Tantchev*, 916 F.3d 645, 657 (7th Cir. 2019) (quoting *Rodriguez*, 63 F.3d at 558). This court's July 2016 order observed that the weight of evidence against Petitioner "raise[d] troubling issues." *Evans*, 2016 WL 3633315, at *11. This factor weighs heavily in favor of Petitioner's claim. Jeffers was interviewed by homicide detectives on the day of the shooting but told them that he had not seen who shot Williams. (*Id.* at H-150.) It was not until eleven months later that Jeffers, then an inmate at Vienna Correctional Center, identified Petitioner from a photo array. (*Id.* at H-100–02.) That photo array—which the State failed to preserve—presented Jeffers with six photos, three of which were of suspects in the case (Tr. Vol. III at I-51), meaning that, as Petitioner argues, Jeffers had a fifty-fifty chance of

identifying one of the suspects.[10]  Two months later at the Du Quoin boot camp, Jeffers gave a statement (also now lost) that he saw Petitioner, in the back seat of the Oldsmobile, lean forward and shoot Williams out the front passenger window.  (*Id.* at I-21.)  That statement also recounts that on the day after the shooting, Jeffers was watching John pitch quarters on the same street when Petitioner and Mario Young returned to apologize to them for the shooting. (*Id.* at I-23–24.)  In December 1997, Jeffers identified Petitioner and Young as the shooters when ASA Lorenz showed him their photos.  *Id.* at I-113–14.  Jeffers's December 1997 testimony to the grand jury—the full transcript of which the State also failed to preserve[11]— similarly discussed seeing Petitioner shoot Williams and apologize for the shooting the next day. (*Id.* at I-124–26.)  At trial, Jeffers recanted all of this—the photo identifications, statement, and grand jury testimony—claiming that the police had coerced him. (*Id.* at I-168.)

No other trial evidence connected Petitioner to the crime.  In other words, Petitioner's conviction rested solely on Jeffers's prior out-of-court statements that he renounced as having been given under police pressure.  Respondent notes that the testimony of a single witness can support a conviction, *see Kines v. Godinez*, 7 F.3d 674, 678 (7th Cir. 1993), but what matters here is whether the evidence was so significant that the prosecutor's improper statements could not have meaningfully altered the jury's verdict.  *Howard*, 225 F.3d at 793.  Moreover, unlike in

---

[10]     The court mentions the identification procedure not because it necessarily violated Petitioner's rights. *See United States v. Jones*, 872 F.3d 483, 490 (7th Cir. 2017) (explaining that there is a two-prong approach for determining whether an identification procedure "offends due process").  Indeed, Respondent would seem to be correct that a claim for suggestive identification has not been exhausted and is untimely. Rather, the court agrees with Petitioner that the identification procedure used diminishes the weight of Jeffers's July 1997 identification of Petitioner.

[11]     In fact, the State has admitted that it lost all trial exhibits. Petitioner has requested that the court draw an adverse inference from the missing evidence, but such an inference is appropriate only if the evidence is destroyed in bad faith. *Bracey v. Grondin*, 712 F.3d 1012, 1018 (7th Cir. 2013). There is no basis here to conclude that the loss of the exhibits was the result of anything other than the negligence.

*Howard*, 225 at 793–94, where the improper remarks "did not go to the heart of the prosecution's case," here the prosecutor's comments concerned the intimidation of the only witness who at any point had identified Petitioner as Williams's killer.

Petitioner Evans's murder conviction rested on out-of-court statements of a single witness, first given eleven months after the shooting, and all recanted at trial.   In rebuttal closing, the prosecutor explained the recantation as a product of intimidation.   No evidence supported that statement, however, and the state court's determination to the contrary was not reasonable.   This court concludes that those improper statements appear to have "'so infected the trial with unfairness as to make the resulting conviction a denial of due process.'"  *Darden*, 477 U.S. at 181 (quoting *Donnelly*, 416 U.S. at 643).   Evans's § 2254 petition is therefore granted.

## <u>CONCLUSION</u>

Because Petitioner has met all the requirements for issuance of a writ of habeas corpus, Evans's Petition [1] is granted. Petitioner's conviction and sentence for the murder of Moatice Williams is vacated, and the state is directed to re-try him in 120 days.

ENTER:

Date:  November 18, 2019
_____
REBECCA R. PALLMEYER
United States District Judge